# UNITED STATES DISTRICT COURT
### for the
### DISTRICT OF RHODE ISLAND

SARAH ALHOUTI

     *v.*                                         C.A.No.: 20-cv-

                                                   **Plaintiff Demands a Jury Trial**

PROVIDENCE COLLEGE,


## COMPLAINT


1.     This is a claim for equitable and declaratory relief and for damages for violation of the Rhode Island Fair Employment Practices Act, R.I.G.L. §28-5-1, et seq., the Rhode Island Civil Rights Act, R.I.G.L. §42-112-1 et seq., 28 U.S.C. §2000(e) and §2000(e)-3, also known as Title VII of the Civil Rights Act of 1964, 42 U.S.C. §1981, 42 U.S.C. §2000d, also known as Title VI of the Civil Rights Act of 1964, 20 U.S.C. §1681 et seq., also known as Title IX of the Education Amendments of 1972, the Americans with Disabilities Act, 42 U.S.C. §12101 et seq. and the Civil Rights of People with Disabilities, RIGL §42-87-1, et seq.

2.     The plaintiff filed a charge with the Rhode Island Commission for Human Rights, 20 EMD 197-06/06, and thereby the Equal Employment Opportunity Commission, 16J-2020-00146, and has received a Right to Sue from both Commissions and has thereby satisfied any and all administrative prerequisites to suit.

**Parties**

3.     Plaintiff Sarah Alhouti is a resident of the State of Rhode Island.

4. The defendant Providence College is a domestic corporation and institution of higher learning within the State of Rhode Island and Providence County therein.

## Statement of Facts

5. The plaintiff is a Muslim, female, person of color and from the Country of Kuwait.

6. The defendant had knowledge and as aware of the plaintiff's religious affiliation, gender, race and country of origin.

7. Plaintiff suffers from sickle cell anemia.

8. The defendant was made aware of plaintiff's suffering from sickle cell anemia.

9. The defendant is an employer as that term is defined by R.I.G.L. §28-5-6.

10. The defendant receives public funding and is thereby subject to the prohibitions of Title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000d et seq.

11. Plaintiff was hired as an assistant professor in the marketing department by Providence College in August of 2014.

12. At the time of plaintiff's hire, Dr. Jelinek, a white, Christian, male was the chair of the marketing department.

13. On or about September 21, 2015, Dr. Jelinek established work duty assignments to cover the following two years which required plaintiff, a female Muslim person of color to do substantially more work than a white male professor of similar term of employment.

14.    At or about this same time, another tenure-track professor within the same department, also a white male, was also assigned fewer work duty assignments than plaintiff during the time that Dr. Jelinek was chair.

15.    Plaintiff objected to the distribution of the work duties between the three non-tenured professors referenced above and plaintiff's complaints and objections were ignored.

16.    On or about November 4, 2015, Dr. Jelinek told plaintiff that she didn't fit in and should go to a different school.

17.    Dr. Jelinek's comments to plaintiff, who is the only Kuwaiti on campus, the only Muslim professor in the school of business, the only woman faculty who wears a hijab in the Providence College business school, and the only woman of color and Muslim in the marketing department, caused plaintiff to more severely notice that she was different in the Providence College homogenous environment and that could be an ongoing problem.

18.    Starting in the spring 2016, plaintiff's image was aggressively utilized in the Providence College marketing materials (three different web pages and two different banners on campus), tokenizing plaintiff's appearance when she knew there weren't other faculty or students on campus that tended to resemble her.

19.    Dr. Jelinek's comment, set forth above, caused plaintiff to reassess comments made at Providence College regarding plaintiff's background, from curiosity to inappropriate and plaintiff's reactions became pronounced, keeping plaintiff awake at night, and deeply saddened.

20.    On or about November 13, 2015, plaintiff informed Dr. Maxfield, a Dean at Providence College, of the incident with Dr. Jelinek at which point Dr. Maxfield asked plaintiff solely how many times Dr. Jelinek had repeated the comment.

21.     Dr. Maxfield, at the meeting on November 13, 2015, made it clear that she wasn't going to do anything about Dr. Jelinek's inappropriate actions.

22.     Starting in December 2015, plaintiff started going to counseling to help her manage the stress that was impacting her illness, including the number of preparations and the unwelcoming behavior plaintiff received from Dr. Jelinek.

23.     Plaintiff's counselor recommended that she reduce the number of hours she worked (plaintiff was working approximately 60 hours a week at that time).

24.     In or about January 25, 2016 plaintiff, after a medical appointment, consistent with the business school handbook, notified Dr. Jelinek that she couldn't attend classes that whole week and needed assistance finding someone to cover her classes.

25.     Dr. Jelinek refused to assist plaintiff with finding anyone to cover her classes.

26.     On or about Thursday, January 28, 2016, Dr. Jelinek emailed plaintiff to inform her that she had missed a meeting during the week she was out for medical reasons, ignoring the information plaintiff had previously provided.

27.     On or about February 6, 2016, plaintiff emailed Dr. Jelinek to inform him that she was ill and required coverage, ccing Dr. Maxfield and attaching the doctor's note stating the length of time plaintiff would not be able to attend work and indicating the nature of the disability.

28.     On or about May 31, 2016, Dr. Jelinek provided an evaluation of plaintiff's teaching that was, without support and basis, extremely negative.

29.     Dr. Jelinek's evaluation included quotes and short phrases from plaintiff's students taken out of context to spin things in a negative light even though plaintiff's PTE for that year was mostly scored as an adequate positive evaluation.

30.     Upon information and belief, Dr. Mark DeFanti (transitioning chair) and Dr. Dan Horne (Associate dean) interpreted the letter to mean that Dr. Jelinek disliked plaintiff.

31.     On or about June 7, 2016, plaintiff met with Dr. Horne to discuss her annual evaluation as prepared by Dr. Jelinek.

32.     On or about October 12, 2016, plaintiff became aware that she was being excluded by Dr. Horne from events for tenure track faculty.

33.     On or about March 28, 2017, plaintiff met with Dr. Horne, Associate Dean, at which time he stated that he didn't understand the negative teaching ratings because he has observed plaintiff's teaching, as such the reasons would be discriminatory as he doesn't have the same issue as a white greyed haired male in the classroom and that the teaching evaluation doesn't evaluate teaching and if the administration wants to evaluate teaching they should choose a way that assesses teaching.

34.     On or about March 31, 2017, plaintiff was informed that the department would schedule a meeting to assist her with her teaching and that they would hire a consultant.

35.     No such meeting was scheduled and a consultant was not hired until the Fall of 2019, more than two years later, and the last semester that plaintiff can report her teaching for the tenure and promotion process.

36.     On or about April 11, 2017, at plaintiff's third year review meeting Dr. Maxfield, in addressing plaintiff's teaching stated that professors from where PhD is a privilege, implying foreign professors, tend to see learning as a gift and as a result pressure or push their students to work harder with said comment being in the context that another foreign professor who doesn't seem to obtain high teaching evaluation because of his behavior as a foreign professor, acknowledging that student teaching evaluations are biased against foreign faculty.

37.     Plaintiff filed a Bias-Related Incident report on or about April 19, 2017 based on Dr. Maxfield's statements.

38.     On or about April 24, 2017, plaintiff met with Dr. Zapata, Chief Diversity Officer, at which point plaintiff reported to him the discriminatory behavior she had received to date, including but not limited to the information set forth above.

39.     On or about May 9, 2017 plaintiff had a follow up meeting with Dr. Zapata wherein he informed plaintiff that he met with Dr. Horne and informed him that plaintiff felt unwelcome.

40.     Plaintiff asked Dr. Zapata to document the incidents and he refused.

41.     On or about August 9, 2017 plaintiff met with Dr. Horne for her annual evaluation wherein Dr. Horne stated that plaintiff was doing well in all three areas, research, teaching, and service.

42.     In the Fall Semester of 2017, plaintiff took maternity leave after the birth of her son.

43.     On or about November 27, 2017, Dr. DeFanti made negative comments about plaintiff's use of maternity leave. Dr. DeFanti also made other negative comments about plaintiff's use of maternity leave in  or about August of 2018.

44.     On or about November 27, 2017, Dr. DeFanti stated that he wouldn't vote for plaintiff's tenure if she didn't have more semesters to teach.

45.     On or about August 6, 2018 plaintiff, seeking an accommodation for a disability, contacted Ms. Walsh from the Human Resource department to inform her that the link to complete ADA reasonable accommodation was not working for plaintiff to complete the form and on or about August 15, 2018 Ms. Walsh responded to plaintiff with a link to complete the ADA form.

46.     On or about August 17, 2018 plaintiff met with Dr. DeFanti for what was supposed to be plaintiff's annual evaluation but plaintiff's annual evaluation was never discussed and during which meeting Dr. DeFanti admitted that he had not been nice to plaintiff in the past.

47.     On or about September 12, 2018, Dr. DeFanti, department chair, assigned Dr. Jelinek and Dr. Chelminski to design a marketing minor.

48.     On or about September 13, 2018, plaintiff completed the ADA disability accommodation form and emailed it to Ms. Walsh from the Human Resource department, requesting a fair allocation of work and flexible work schedule for doctor visits.

49.     On or about September 24, 2018, Ms. Walsh from the Human Resource department stated she would talk to the marketing department chair to implement the requested accommodation.

50.     On or about October 24, 2018, plaintiff met with Dr. DeFanti, the department chair, to conduct plaintiff's annual evaluation, almost three months late per the business school handbook.

51.     In the meeting with Dr. DeFanti, the discussion is negative, as the chair asked plaintiff to do more class preparation than plaintiff's non-minority, non-Muslim, American born, male tenure track colleague.

52.     On or about October 26, 2018, plaintiff provided a summary of the meeting with Dr. DeFanti to Dr. DeFanti and the Associate Dean, expressing that plaintiff believes she is being targeted for being different.

53.     Dr. DeFanti's relationship with plaintiff changed materially as a result of plaintiff's report of discrimination.

54.     On or about October 24, 2018, plaintiff contacted Ms. Walsh inquiring as to the status of her approved disability accommodation.

55.     On or about October 29, 2018 Ms. Walsh informed plaintiff that she had not yet discussed with Dr. DeFanti the accommodation of plaintiff's disability.

56.     On or about October 30th, 2018, Ms. Walsh asserts she needs more information to address plaintiff's request for accommodation of a disability following thereafter on or about November 5, 2018 with what the information she asserts she needs.

57.     On or about November 7, 2018, at a marketing department meeting, the design of the minor is discussed and a course that only plaintiff taught was demeaned and asserted to not be in the promotional mix.

58.     Dr. DeFanti, Department Chair, asked the department to vote on the execution of the minor which was approved and wherein plaintiff objected.

59.     On or about November 21, 2018, plaintiff informed Ms. Walsh that plaintiff's social worker had provided the requested information on November 16, 2018.

60.     On or about December 3, 2018 plaintiff inquired as to the status of the disability accommodation request.

61.     On or about December 4, 2018, Ms. Walsh asked plaintiff to meet for more clarification regarding the disability accommodation request, at which point the documentation had been with Ms. Walsh for almost three weeks without processing and without Ms. Walsh contacting plaintiff with any questions and/or issues.

62.     On or about January 18, 2019, at a marketing meeting, plaintiff raised that teaching evaluations are discriminatory against women to which Dr. Jelinek, at least three times, was clearly  dismissive and viewed the position as without merit while refusing to accept

support for the position and failing and refusing to providing any evidence or support for his position.

63. On or about January 28, 2019, plaintiff inquired again as to the status of the disability accommodation process.

64. On or about February 8, 2019, plaintiff learned that she was being excluded by Dr. Horne from attending junior faculty events.

65. Dr. Horne's acts of ostracism effected plaintiff's ability to perform her job duties and created a discriminatory environment.

66. On or about February 19, 2019, plaintiff inquired again as to the status of the disability accommodation process.

67. On or about February 20, 2019, Ms. Walsh informed plaintiff that plaintiff need do nothing more for her disability accommodation request and will provide the response to the request for accommodation within one week and Ms. Walsh fails to contact plaintiff as she stated.

68. On or about March 5, 2019, plaintiff attempted to schedule an appointment with Dean Maxfield regarding discrimination, and specifically the inclusiveness of the business school and plaintiff was informed by Dr. Maxfield that plaintiff must report that a meeting is occurring with the department chair, Dr. DeFanti, a requirement never before in place and this is the first time Dr. Maxfield has required plaintiff to report a meeting to the department chair.

69. On or about March 6, 2019, Dr. DeFanti approached plaintiff after a marketing meeting, while another faculty member was still in the room, to discuss with plaintiff what the intended meeting with Dr. Maxfield was about and if it was about what they had discussed previously, plaintiff's complaints relating to the treatment of her disability.

70.     On or about March 7, 2019, plaintiff met with Dr. Moore, a visiting instructor on matters of diversity and equity in the business school and discussed with Dr. Moore the discriminatory actions of Dr. Horne.

71.     Based on the advice and request of Dr. Moore, plaintiff canceled her meeting with Dr. Maxfield because plaintiff believed Dean Maxfield was trying to silence her by having her give notice of her complaints directly to the department.

72.     In or about April, 2019, plaintiff is assigned two class preparations in violation of the disability accommodations plaintiff had been informed were in place.

73.     On or about April 8, 2019, plaintiff received an email from Ms. Walsh to schedule a meeting to finalize the disability accommodation request and they met on or about Thursday April 11, 2019 and discussed developing a process that could take place when plaintiff is too ill to work, having a discussion with the department chairs, and that the process would take into the Fall of 2019 to develop.

74.     As of the date of this filing, plaintiff has not received information on the disability accommodation process that will take place.

75.     After the meeting with Ms. Walsh, on or about April 8, 2018, Dr. DeFanti walked into plaintiff's office stating that they will acknowledge the disability accommodation request as it's a legal issue but they would not abide by its requirements for any length of time indicating that Dr. DeFanti would prefer to have a different faculty member in plaintiff's position.

76.     On or about April 26, 2019, plaintiff met with Ms. Peterson, Special Advisor to the President, and described the discriminatory incidents to that date and Ms. Peterson requested plaintiff email a listing of the discriminatory incidents, which plaintiff did and

Ms. Peterson confirmed that the incidents had not been previously documented, including plaintiff's filing of the bias-incident form.

77. On or about May 6, 2019, plaintiff received a PTE conducted by Dr. Jelinek for an observation he conducted on April 11, 2019 wherein the evaluation was, without cause or basis, 80% negative, including the highest amount of Needs Improvement scores plaintiff has received on any PTE during plaintiff's entire career at Providence College.

78. Plaintiff attempted to schedule a meeting with Dr. Jelinek for coffee, hoping that it would help him see plaintiff as a human rather than someone he is trying to hurt and he refused the meeting.

79. Due to plaintiff's desire to stay at Providence College and in light of the bullying treatment received by plaintiff and the increasing feeling of loss and hopelessness, plaintiff scheduled a meeting with Dr. Maxfield and Ms. Peterson to help with resolving the ongoing discrimination.

80. On or about May 8, 2019, plaintiff arrived at the meeting with Ms. Peterson to be informed that the meeting would not take place due to a calendar conflict.

81. On or about May 10, 2019, plaintiff met with the Provost, Dr. Lena, and explained the past discrimination she had suffered to which Dr. Lena stated that faculty don't tend to get denied for tenure unless there are extreme issues like not attending classes and suggested writing an objection to the PTE to Dr. Jelinek and department chair, Dr. DeFanti.

82. On or about May 10, 2019, plaintiff met with Dr. Maxfield about the PTE at which time Dean Maxfield said she would talk to the defendant's lawyer to remove the PTE. Plaintiff explained in this meeting that she would be afraid of retaliation if she were to take the approach of writing an objection email as the provost recommended.

83.     On or about May 16, 2019, plaintiff met with Ms. Peterson and expressed her concerns about a PTE evaluation given the history she had with Dr. Jelinek and that he was conducting the evaluation based on a biased, discriminatory intent and Dr. Peterson shared with  plaintiff the availability of a complaint under Title VI (complaint process for discrimination by an entity receiving federal funds).

84.     On or about May 17, 2019, Dean Maxfield informed plaintiff that the defendant's lawyer said she couldn't remove the PTE file and Dean Maxfield recommended plaintiff pursue a Title VI complaint.

85.     On or about May 28, 2019, plaintiff met with Dean Maxfield for her annual evaluation wherein the dean stated that plaintiff is in good shape for tenure and complements plaintiff's teaching.

86.     In the annual evaluation with the dean in 2019, Dean Maxfield complements plaintiff's teaching and doesn't raises any issues of concern and requests plaintiff work with a consultant in the Fall, with which plaintiff complied.

87.     On or about May 29, 2019 plaintiff shared the third year review letter with Mrs. Peterson to demonstrate plaintiff's concern of the ambiguity of the third year review and delivered the PTE evaluation from Dr. Jelinek and the third year letter at which time plaintiff inquired, based on the continuing discrimination, whether there are any solutions other than a Title VI complaint that could be pursued. Mrs. Peterson recommends meeting with Dr. Morton to discuss potential solutions.

88.     When meeting with Mrs. Peterson in May of 2019, plaintiff asked Mrs. Peterson what plaintiff should do.

89.     Mrs. Peterson stated that she is going to meet with the appropriate person to make it stop.

90.    Mrs. Peterson's actions to remedy to discrimination were feeble and without any effect.

91.    Mrs. Peterson's limited efforts made things worse as the department chair retaliated against plaintiff.

92.    The department chair complimented a colleague's work when her biggest part of the class, the project, was a copy and paste of plaintiff's work product and plaintiff received no positive feedback for the same work.

93.    On or about July 3, 2019, plaintiff met with Ms. Peterson to talk about the annual evaluation and Dr. DeFanti at which time plaintiff stated that she was nervous about the annual evaluation because conversations with the chair of the department, as set forth above, have not been positive conversations and the annual evaluations are vague and hard to know how to address and plaintiff is uncomfortable because Dr. DeFanti had made derogatory comments on plaintiff's maternity leave.

94.    On or about July 19, 2019, a phone call is scheduled between plaintiff and Ms. Peterson to discuss having someone from the diversity office assist plaintiff at the annual evaluation meeting and Ms. Peterson recommends plaintiff bring Ms. Moore.

95.    On or about July 30, 2019, the first meeting for plaintiff with the teaching consultants recommended by Dean Maxfield is scheduled.

96.    On or about August 6, 2019, plaintiff is notified that Ms. Moore will not accompany plaintiff to the annual evaluation meeting and that she is attempting to schedule a meeting with Dr. Morton for the week of August 13, 2019.

97.    Plaintiff's annual evaluation for 2018-2019 occurred on August 14, 2019 (a month late, thereby creating issues with implementation of concepts contained therein), wherein

plaintiff received two positive PTE's for her 2018-2019 teaching evaluations, however plaintiff's annual evaluation only highlights Dr. Jelinek's negative assessment.

98. On or about August 15, 2019, plaintiff attempted, by email, to schedule a meeting with Ms. Peterson and Dr. Keith to discuss plaintiff's Title VI complaint process.

99. On or about August 27, 2019, Ms. Peterson informs plaintiff that she cannot meet on the scheduled date and offers options to reschedule.

100. On or about September 3, 2019, plaintiff emailed Ms. Peterson a suggested date to meet and plaintiff received no response.

101. On or about September 18, 2019, the business school faculty met and Dr. Maxfield presented a Diversity, Equity and Inclusion Update which was aggressively challenged by Dr. Jelinek, exemplifying his objection to diversity, equity and inclusion.

102. On or about September 18, 2019, immediately following the meeting set forth in the preceding paragraph, plaintiff contacted Dr. Morton directly to schedule a meeting to address the ongoing discrimination.

103. On or about September 20, 2019, plaintiff met with Dr. Morton and informed him of the prior incidents with Dr. Jelinek to which Dr. Morton stated that Dr. Jelinek will not stop and its best to pursue a Title VI process. Plaintiff inquired as to how long the process would take to which Dr. Morton stated it would take about a week. Plaintiff formally requested a Title VI investigation.

104. A meeting is scheduled for on or about September, 26, 2019 wherein plaintiff is to submit a description of the incidents which serve as the basis of her Title VI complaint was cancelled by Ms. Peterson and rescheduled to October 2, 2019.

105.    On or about October 2, 2019, plaintiff met with Ms. Peterson and submitted the Title VI complaint against Dr. Jelinek.

106.    At the meeting referenced in the preceding paragraph, plaintiff discussed her meeting with Dean Maxfield as a result of the discussions about the issues plaintiff had been having in the department and Ms. Peterson stated that Dean Maxfield talked to Dr. DeFanti about conducting the annual evaluations on time, that Mrs. Peterson met with Dean Maxfield about the issue of the ambiguity of the third year review, that Dean Maxfield realizes that they are providing ambiguous feedback and they are working to improve it.

107.    On or about October 3, 2019, plaintiff notified the department chair, Dr. Wright, that plaintiff will not be able to attend the students' exam on October 4, 2019, due to illness, and that someone will need to cover plaintiff's classes. Dr. Wright responded, contrary to handbook policy, that plaintiff should reach out to others to cover her classes.

108.    On or about October 18, 2019, plaintiff met with Ms. Peterson and Dr. Morton wherein they state that there is a systematic issue with the department and that it is better to block the department from the tenure process than pursue only Dr. Jelinek because Dr. Jelinek seems like a person that cannot be convinced and that from evaluation of the material submitted at their request my teaching looks good, causing them to question Dr. Jelinek's most recent PTE.

109.    On or about November 7, 2019 plaintiff met with the Ms. Peterson, Dr. Morton, and Dr. Boos, Senate President and plaintiff's advisor. They report to plaintiff that they have a meeting scheduled with Dean Maxfield, who doesn't agree about blocking the department and described Dean Maxfield as defensive and asserting that it's all in plaintiff's head.

110.    On or about November 11, 2019, plaintiff requested the notes from her meeting with Dean Maxfield and on or about November 15, 2019 and plaintiff is informed that the notes will not be shared with plaintiff.

111.    On or about November 19, 2019, plaintiff met with Dr. Morton to go over the responses provided by Dr. Maxfield which include:

- The salary offered to plaintiff was lower than Dr. Newman's salary offer, even though plaintiff and Dr. Newman were hired at or about the same time;
- It is acceptable to exclude plaintiff from events with alcohol;
- Dr. DeFanti statement that his position that he wouldn't vote for plaintiff if plaintiff didn't delay plaintiff's clock for tenure consideration is positive to give plaintiff more opportunities to teach;
- Dr. Jelinek's PTE for plaintiff is similar to all other PTE he has done but she did try to get it removed by defendant's legal counsel. Her resolution to the PTE is to hire plaintiff the teaching consultants;
- Its Ok to start the marketing minor at Providence College on a discriminatory basis because its labeled as a pilot.

112.    On or about November 19, 2019, Dr. Morton stated that an informal resolution could help because sharing the complaints with Dr. Jelinek could resolve the issue and a formal resolution could lead to retaliation in the tenure process.

113.    On or about November 21, 2019, plaintiff has a telephone conference with Dr. Morton and Mrs. Peterson to pursue the informal complaint process regarding Dr. Jelinek.

114.    On or about November 25, 2019, plaintiff has a telephone conference with Dr. Morton and Mrs. Peterson to discuss the process regarding the informal Title VI complaint process pertaining to Dr. Jelinek.

115.    On or about November 27, 2019, plaintiff contacted Dr. Wright (department Chair) and Mrs. Duane (in charge of documentation for the tenure and promotion process) to clarify what the strategic teaching/learning objectives are that the PCSB handbook requests for evaluation on tenure and promotion.

116.   On or about December 1, 2019, Mrs. Duane stated to plaintiff and the department chair that the measurements had not been decided on for the Strategic Plan of 2020 and the strategic plan is still not approved.

117.   On or about December 1, 2019, Mrs. Duane directed plaintiff to the 2013-2017 Strategic Plan for guidance.

118.   Other questions plaintiff asked of Mrs. Duane, while copying the department chair, include clarification of what an overall score means and what the following means: "An evaluation of teaching performance inside and outside the classroom, which includes a discussion of: (i) c. Level of challenge of courses, (ii) f. An assessment of the candidate's completion of his/her advising duties, (iii) Specifically is the challenge of courses - referring to the subject or my teaching of the class? Is there a particular assessment utilized for advising duties?"

119.   Mrs. Duane responds by asking Dr. Wright to provide guidance on the assessment of advising, and Dr. Wright did not provide any guidance or information.

120.   Mrs. Duane further responds to measure the overall score with a metric of plaintiff's choice as previous faculty members had picked what fits them.

121.   Dr. Wright and Mrs. Duane do not respond to what the level of challenge of courses means.

122.   Plaintiff visited Dr. Wright's office to ask what the metric is that needs to be assessed, to which he said he didn't know and concurred with Mrs. Duane to pick the metric that plaintiff liked.

123.   On or about December 4, 2019, Dr. Maxfield informs plaintiff that the "overall score" is no longer used in the evaluation of the faculty and recommends the use of

objectives from the Strategic Plan of 2020, directly contradicting Mrs. Duane's assessment of what teaching metric to use. This correspondence is forwarded to the department chair.

124.   On December 5, 2019 the department chair, Dr. Wright, shares a Departmental Diversity Study in which the chair states that the marketing faculty is underrepresented in female faculty and people of color, that the people in color who were interviewed in the last hiring cycle were insufficient, and that: "Our biggest concern is that our increase in rigor may be scaring off students of color who need to maintain a minimum grade point average to keep their scholarships. We hope that our forthcoming proposed change in major, which will push the MKT 205 Principles of Marketing course to the fall of sophomore year will alleviate these concerns and permit students to acquire the quantitative analysis skills they need to succeed in marketing."

125.   As the department believes that the Principles of Marketing class is discouraging minorities from staying in the major, the continued practice is thereby discriminatory and the department is placing pressure on plaintiff to teach in this manner, which is requested in the annual evaluation and thereby directing plaintiff to use methods that result in the removal of minority students.

126.   On or about December 9, 2019, the teaching consultant utilized by the defendant for plaintiff writes a recommendation letter detailing the successful work that has been done and complements plaintiff's teaching to the department chair, Dr. Wright to be included in plaintiff's dossier.

127.   On or about December 20, 2019, plaintiff met again with Mrs. Peterson and Dr. Morton wherein they state that they will provide the notes from their meeting with Dr. Jelinek.

128.   At the meeting referenced in the preceding paragraph, plaintiff inquired as to whether Dr. Jelinek would agree to the outcome by the informal process and Dr. Morton

said he would not. Dr. Morton, during this meeting, also referenced that he had to leave the English department because it was a negative environment posing the question whether plaintiff wanted to create a negative environment in the marketing department with the pursuit of the Title VI complaint. Mrs. Peterson and Dr. Morton provide plaintiff through January 13, 2019 to provide a response on how to move forward with plaintiff's complaints of discrimination.

129.    On or about December 21, 2019, Mrs. Peterson and Dr. Morton provide plaintiff with a summary of the discussion with Dr. Jelinek in which Dr. Jelinek falsely asserts that students complained of plaintiff's use of offensive language in class.

130.    On or about January 7, 2020, Mrs. Duane requests of plaintiff that she provide her PTE and annual evaluations that had been attached to the email in contradiction to the Business School Faculty Handbook and the department chair's responsibilities to do so. This request establishes that the department chair failed and refused to comply with the filing requirements by the filing deadline of December 15, 2019. Nevertheless, plaintiff complied with the request.

131.    On or about January 13, 2020, plaintiff requested from Mrs. Peterson and Dr. Morton an extension on the deadline for how to move forward with the Title VI process.

132.    On or about January 14, 2020, Dr. DeFanti contacts plaintiff and copies Dean Maxfield and Dr. Wright, department chair, in an attempt to disparage and demean plaintiff, to inform plaintiff that she didn't go to a meeting to discuss the principles of marketing class that was scheduled in January attempting to portray that plaintiff was refusing to engage in dialogue regarding a class when the process was engaged with the consultant previously referenced and with which Dr. DeFanti refused to engage.

133.    On or about January 16, 2020, Dr. DeFanti confirmed to plaintiff that the dean has told him that he didn't give plaintiff enough time to incorporate the class changes he wanted.

134.    On or about January 18, 2020, plaintiff emailed questions regarding the formal Title VI process that include:

- To clarify the role of advisor in the process can be someone outside of Providence College?
- Who the investigator would be for the Title VI process?
- How do you select the investigator?
- Plaintiff would like an attorney representative to be present in the formal process. How much time would plaintiff have to consult with a lawyer and get the lawyer up to date on the issue?

135.    On or about January 19, 2020, plaintiff is provided by representatives of the defendant that information about the Title VI investigator will only be provided if plaintiff takes issue with the investigator when the formal process starts and that plaintiff is not allowed to bring a lawyer in the formal process.

136.    On or about January 21, 2020, plaintiff was informed that the defendant would make the name of the investigator available to plaintiff by January 24, 2020, the defendant fails to provide the name of the investigator by January 24, 2020.

137.    On or about January 23, 2020, plaintiff repeats to defendant the question that had not been addressed which is how much time plaintiff would have to hire and get a lawyer for the Title VI process.

138.    On or about January 27, 2020, plaintiff is informed by the department chair, Dr. Wright, that the department voting on teaching was not favorable.

139.    Upon information and belief, the department vote as to plaintiff's tenure was 5-1 against with the five voting against being the five white male members of the department and the one affirmative vote being the one female in the department.

140.    On or about January 28, 2020, plaintiff inquired as to the reasons for the teaching vote.

141.    On or about January 28, 2020, Dr. Wright refers plaintiff to the faculty handbook for the process of seeking the reason; the handbook does not have a process for seeking the reasons for a teaching vote.

142.    On or about January 28, 2020, plaintiff inquired again about the Title VI investigator with  an immediate response that no investigator has been confirmed.

143.    On or about January 29, 2020, defendant informs plaintiff that defendant will not provide to plaintiff who the Title VI investigator will be.

144.    On or about February 5, 2020, plaintiff requested from the department chair the reason for the vote given that the chair can offer their reasoning, copying Dr. Maxfield on the correspondence  to confirm the process.

145.    On or about February 6, 2020, Dr. Wright approached plaintiff and informed her that Dr. Maxfield instructed Dr. Wright to tell plaintiff that the reason was based on plaintiff's dossier.

146. On or about February 6, 2020, plaintiff forwarded an email, from October 10, 2019, to Dr. Maxfield wherein the Provost, Dr. Lena, states that: "At my dean's meeting last week, I indicated that the Handbook does not prohibit chairs from sharing areas of concern with candidates, only that the vote cannot be shared. I further indicated that the Handbook does prohibit giving the exact vote. I couched my remarks in the context of transparency. I asked that they share this with their chairs so we'll see what happens."

147. In plaintiff's email referenced in the preceding paragraph, plaintiff inquired as to why the reasons for the negative vote are not being shared with plaintiff.

148. On or about February 6, 2020, plaintiff receive a response stating that plaintiff would not receive the reason because it is not in the handbook and the business school has never give reason in the past: "The communication between Prof. Keating and Provost Lena raises an issue that I do not recall discussing, even though Hugh indicates it was discussed with the Deans. Certainly nothing was shared with Deans in writing indicating we should discuss with Chairs protocols for communication beyond what is required by the Faculty Handbook. What you are asking has not been part of our P&T practice at the PCSB during my tenure. As I am sure you can appreciate we operate the P&T process by closely following the Faculty Handbook which does not stipulate the reporting you are asking for."

149. There is no portion of the defendant's Faculty Handbook preventing the chairs from sharing the reason for a vote as requested by plaintiff.

150. On or about February 12, 2020, plaintiff met with the provost who informed plaintiff that he told the chair or the dean (he couldn't remember) that the reason for the

vote is based on plaintiff's peer teaching evaluation and student evaluations and that the Dr. Jelinek Peer Teaching Evaluation that plaintiff claims is biased had an effect.

151.　The reasons given and relied upon by the Marketing Department members are false, pretextual and without basis and are discriminatory against plaintiff based on her religion, gender, country of origin and race.

152.　At the meeting referenced in the preceding paragraph, plaintiff inquired of the provost as to the Title VI process and received a response from the provost that he doesn't know anything about the Title VI process. Plaintiff informed the provost that the Title VI process goes to him for a decision to which he responded that he hasn't had one delivered to him because the school is not good at handling Title VI complaints.

153.　On or about February 19, 2020, plaintiff, while reviewing the dossier material to prepare for her meeting with the Committee on Academic Rank and Tenure, noticed a memo written to plaintiff for her third year review from Dean Maxfield that was never shared with plaintiff prior to the January 7, 2020 vote by the department. Mrs. Duane office confirmed that the document was not shared with plaintiff.

154.　On or about March 4, 2020, plaintiff received information that that the Committee on Academic Rank and Tenure voted to award plaintiff tenure and that the promotion is still subject to plaintiff meeting with Father Shanley.

155.　Plaintiff has never been asked to meet with Father Shanley.

156.　On or about April 8, 2020, plaintiff received a letter dated April 3, 2020 from Father Shanley stating "After receiving recommendations from the Committee on Academic Rank

and Tenure and the Department of Marketing, and after having given consideration to those recommendations, I have decided to sustain the recommendation of the department that you not be granted tenure with promotion to associate professor at this time."

157.    In the faculty handbook under 3.3. The Committee on Academic Rank and Tenure states:

> "All new appointments, reappointments, promotions, decisions not to reappoint, the granting of tenure, and dismissals are made by the president, acting for the Board of Trustees and in accord with the norms and standards set forth in this *Faculty Handbook*. In carrying out this aspect of his responsibility, the president is guided, but not bound, by the recommendations of the Committee on Academic Rank and Tenure. Faculty status and related matters are the primary responsibility of the Committee on Academic Rank and Tenure as it functions in conjunction with the departments and programs.

> Normally the president shall, on questions of faculty status, as in other areas where the faculty has primary responsibility, concur with the committee's recommendations, except for compelling reasons."

158.    Plaintiff has not been given any compelling reason(s) for the president not to take the Committee on Academic Rank and Tenure's recommendation.

159.    The faculty handbook describes the "Grievances Concerning Alleged Inadequate Consideration by the Department or the Committee on Academic Rank and Tenure." describes the appeal process which requires plaintiff demonstrate inadequate consideration.

160.    Plaintiff has not been provided the reasons given for her denial of tenure necessary to address and to demonstrate inadequate consideration.

161.   The appeal process, if approved, returns to the department which can decide to review it or not, in this case a department that has demonstrated bias and acted in a discriminatory fashion toward plaintiff.

162.   Pursuant to § 3.3 regarding The Committee on Academic Rank and Tenure in the faculty handbook, the weight of the decision is based on the committee's decision, not the department's decision.

163.   The manner and form of the appeal places any further decision regarding plaintiff's tenure back in the hands of the department that has discriminated against her in the first instance.

164.   On or about April 9, 2020 plaintiff requested the provost share the department votes and the reason for the votes.

165.   On or about April 10, 2020, plaintiff requested a meeting with the provost.

166.   On or about April 11, 2020, plaintiff was provided the votes cast by the department with the only information shared as to any concern is teaching.

167.   During the process set forth above, when plaintiff finally went to her mentor for help on the discrimination incidents, he said the acts were concerning and that the dean of the department who had been discriminating against plaintiff wouldn't be able to judge plaintiff fairly given how they think about her background, he said plaintiff needed to report it to the diversity office. Plaintiff's first meeting with the diversity office, Dr. Zapata was empathetic but he wouldn't do anything, including document the incidents. He said he'd vouch for plaintiff but did nothing.

168.   After being counseled again to go to the diversity office, plaintiff went, thinking that maybe since there is a new person, things would be different. It was worse as the diversity officer would promise change and deliver nothing. Plaintiff had to retell her story so many times and each time it was as equally painful. Every time nothing happened, even after plaintiff spoke up made things more painful as she was being ignored in a campus that vowed to make its environment more inclusive. Plaintiff just wanted to be able to do her work and ignoring the discrimination issues made it so that it was impossible to work as plaintiff was occupied by the pain of dealing with it, reporting it, and trying to convince people in power to do something about it. To plaintiff, it was just shocking that people can ruin your career as a result of discrimination, and nobody feels the need to do anything and just watch plaintiff suffer through it and lose her job at Providence College.

169.   Plaintiff's Title VI process was a nightmare as both Dr. Morton and Mrs. Peterson seemed unaware of how to do the Title VI process, while plaintiff was trying to achieve some peace from the discrimination issues by resolving the issue, they didn't know what to do. Dr. Morton acknowledged the issue of discrimination is a systematic issue with the department, and his first suggestion would have resolved the issue by blocking the department from voting regarding plaintiff. Plaintiff reiterated every time that it's not enough that they resolve the issue for tenure but what will be done so that plaintiff can still exist in the department without continuous discrimination after tenure. Dr. Morton stated that he is concerned about retaliation from the department, given plaintiff's involvement in the Title VI process. Dr. Morton stated they would attack my teaching as a result, which was what was done. All the promises made never resulted in any action. They never blocked the department, the department retaliated, the department attacked plaintiff's teaching, and she was left with spending endless days preparing for a Title VI and being consumed with the pain of the process due to having to reiterate my experience and being

met with trying to make me believe that it's in my head, for the defendant's representatives to drop it, and delay the process.

170.    Plaintiff suffered, by the actions of the representatives of the defendant, discrimination based on her gender, gender based on pregnancy, color, country of origin, disability, and request for accommodation based on disability.

171.    Plaintiff suffered, by the actions of the representatives of the defendant, retaliation based on her protected activity in reporting discrimination based on her gender, gender based on pregnancy, color, country of origin, disability, and request for accommodation based on disability.

172.    Plaintiff, each step along her suffering discrimination, took affirmative steps to seek remedy internally and each attempt was met with apathy, disdain, refusal to act and attempts to delay and diminish plaintiff's claims.

173.    The actions of the defendants have caused plaintiff a loss of income, emotional distress and other damages.

174.    The defendant's denial of plaintiff's tenure placed plaintiff on a one year employment period after which she would be terminated from her employment.

175.    The collective bargaining agreement between the defendant and the plaintiff's union provides for an appeal/grievance of the denial of plaintiff's tenure.

176.    The appeal/grievance process is intended to provide expedient review of the proffered grievance.

177.    Without an expedient process for plaintiff's appeal/grievance, plaintiff would be forced from her position of employment without review of the tenure decision.

178.   On or about May 11, 2020, plaintiff filed with the Rhode Island Commission for Human Rights a verified charge asserting discrimination as set forth in paragraphs 1 through 170 above.

179.   On or about June 17, 2020, plaintiff filed an appeal of the tenure decision of the defendant, said appeal is considered a grievance pursuant to the union contracts in place.

180.   The defendant, due solely to plaintiff's filing of a charge with the Rhode Island Commission for Human Rights, failed and refused to address the appeal/grievance plaintiff filed pursuant to the collective bargaining agreement in place.

181.   Defendant conditioned their consideration of plaintiff's appeal on her withdrawal of her charge with the Rhode Island Commission for Human Rights.

182.   The timeline of a charge with the Rhode Island Commission for Human Rights would not have allowed plaintiff to remain in her position with the defendant throughout the process and thereby plaintiff would have been forced from her position prior to the completion of the Rhode Island Commission for Human Rights process.

183.   Plaintiff, placed in a position to either pursue her charge with the Rhode Island Commission for Human Rights and the time frame such a charge entails or pursue her appeal within the defendant's process, which should take only a matter of weeks, was forced to seek withdrawal of her charge with the Rhode Island Commission for Human Rights.

184.   The withdrawal was denied by the Rhode Island Commission for Human Rights due to the coercion and retaliation of the defendant.

185.   The defendant has failed and refused to address plaintiff's appeal/grievance.

186. The defendant, through its representatives and employees, has maintained continuing and ongoing discrimination aimed at and suffered by plaintiff and which constitutes a continuing violation of the statutory violations set forth herein.

## COUNT I
*Discrimination – 42 U.S.C. §2000e (Title VII of the Civil Rights Act of 1964)*

187. Plaintiff restates all previous paragraphs by reference as if stated fully herein.

188. The defendant did violate Title VII by the facts described herein, by discriminating against her with respect to hire, tenure, compensation, terms, conditions or privileges of employment because of her religious affiliation, gender, race and country of origin.

189. As a result, she has suffered and continues to suffer damages.

WHEREFORE, plaintiff respectfully requests this Honorable Court award her compensatory damages and all other damages authorized by statute, as well as her costs of litigation and reasonable attorneys' fees pursuant to statute.

## COUNT II
*Retaliation – 42 U.S.C. §2000e (Title VII of the Civil Rights Act of 1964)*

190. Plaintiff restates all previous paragraphs by reference as if stated fully herein.

191. The defendant did violate Title VII by the facts described herein, by retaliating against her because she opposed a practice forbidden by 42 U.S.C. §2000(e) and engaged in protected activity in the form of complaints of discrimination.

192. As a result, she has suffered and continues to suffer damages.

WHEREFORE, plaintiff respectfully requests this Honorable Court award her compensatory damages and all other damages authorized by statute, as well as her costs of litigation and reasonable attorneys' fees pursuant to statute.

## COUNT III
*Discrimination – 42 U.S.C. §1981*

193.   Plaintiff restates all previous paragraphs by reference as if stated fully herein.

194.   The defendants did violate 42 U.S.C. §1981 by the facts described herein, by discriminating against plaintiff with respect to hire, tenure, compensation, terms, conditions or privileges of employment because of his race.

195.   As a result, she has suffered and continues to suffer damages

WHEREFORE, plaintiff respectfully requests this Honorable Court award her compensatory damages and all other damages authorized by statute, as well as his costs of litigation and reasonable attorneys' fees pursuant to statute.

## COUNT IV
*Retaliation – 42 U.S.C. §1981*

196.   Plaintiff restates all previous paragraphs by reference as if stated fully herein.

197.   The defendants did violate 42 U.S.C. §1981 by the facts described herein, by retaliating against plaintiff because she opposed a practice forbidden by 42 U.S.C. §1981 and engaged in protected activity in the form of complaints of discrimination.

198.   As a result, she has suffered and continues to suffer damages.

WHEREFORE, plaintiff respectfully requests this Honorable Court award her compensatory damages and all other damages authorized by statute, as well as her costs of litigation and reasonable attorneys' fees pursuant to statute.

## COUNT V
*Discrimination – 42 U.S.C. §2000d (Title VI of the Civil Rights Act of 1964)*

199.   Plaintiff restates all previous paragraphs by reference as if stated fully herein.

200.   The defendant did violate Title VI by the facts described herein, by discriminating against plaintiff with respect to hire, tenure, compensation, terms, conditions or privileges of employment because of her color, race and country of origin.

201.   As a result, she has suffered and continues to suffer damages.

WHEREFORE, plaintiff respectfully requests this Honorable Court award her compensatory damages and all other damages authorized by statute, as well as her costs of litigation and reasonable attorneys' fees pursuant to statute.

## COUNT VI
*Retaliation – 42 U.S.C. §2000d (Title VI of the Civil Rights Act of 1964)*

202.   Plaintiff restates all previous paragraphs by reference as if stated fully herein.

203.   The defendant did violate Title VII by the facts described herein, by retaliating against plaintiff because she opposed a practice forbidden by 42 U.S.C. §2000(e) and engaged in protected activity in the form of complaints of discrimination.

204.   As a result,  she has suffered and continues to suffer damages.

WHEREFORE, plaintiff respectfully requests this Honorable Court award her compensatory damages and all other damages authorized by statute, as well as her costs of litigation and reasonable attorneys' fees pursuant to statute.

## COUNT VII

*Discrimination – 20 U.S.C. §§ 1681 et seq (Title IX of the Civil Rights Act of 1964)*

205.    Plaintiff restates all previous paragraphs by reference as if stated fully herein.

206.    The defendant did violate Title IX by the facts described herein, by discriminating against plaintiff with respect to hire, tenure, compensation, terms, conditions or privileges of employment because of her gender.

207.    As a result, she has suffered and continues to suffer damages.

WHEREFORE, plaintiff respectfully requests this Honorable Court award her compensatory damages and all other damages authorized by statute, as well as her costs of litigation and reasonable attorneys' fees pursuant to statute.

## COUNT VIII

*Retaliation – 20 U.S.C. §§ 1681 et seq (Title IX of the Civil Rights Act of 1964)*

208.    Plaintiff restates all previous paragraphs by reference as if stated fully herein.

209.    The defendant did violate Title VII by the facts described herein, by retaliating against plaintiff because she opposed a practice forbidden by 42 U.S.C. §2000(e) and engaged in protected activity in the form of complaints of discrimination.

210.    As a result, she has suffered and continues to suffer damages.

WHEREFORE, plaintiff respectfully requests this Honorable Court award her compensatory damages and all other damages authorized by statute, as well as her costs of litigation and reasonable attorneys' fees pursuant to statute.

## COUNT IX
### *Discrimination - R.I.G.L. § 28-5-1 et seq.*

211.   Plaintiff restates all previous paragraphs by reference as if stated fully herein.

212.   The defendant did violate R.I. Gen. Laws §28-5-6, the Rhode Island Fair Employment Practices Act, by the facts described herein, by discriminating against plaintiff with respect to hire, tenure, compensation, terms, conditions or privileges of employment because of her religious affiliation, gender, race, country of origin and disability.

213.   As a result, she has suffered and continues to suffer damages.

WHEREFORE, plaintiff prays this Honorable Court award her compensatory and consequential damages pursuant to Rhode Island General Laws 28-5-24(b) including but not limited to lost income and punitive damages pursuant to Rhode Island General Laws 28-5-29.1 as well as her costs of litigation and reasonable attorneys' fees pursuant to Rhode Island General Laws § 28-5-24(a) and such other relief as the Court deems appropriate.

## COUNT X
### *Retaliation - R.I.G.L. § 28-5-1 et seq.*

214.   Plaintiff restates all previous paragraphs by reference as if stated fully herein.

215.   The defendant did violate R.I. Gen. Laws §28-5-6(5), the Rhode Island Fair Employment Practices Act, by the facts described herein, by discriminating against plaintiff because she opposed a practice forbidden by the Rhode Island Fair Employment Practices Act and engaged in protected activity in the form of complaints of discrimination.

216.   As a result, she has suffered and continues to suffer damages.

WHEREFORE, plaintiff prays this Honorable Court award her compensatory and consequential damages pursuant to Rhode Island General Laws 28-5-24(b) including but not limited to lost income and punitive damages pursuant to Rhode Island General Laws 28-5-29.1 as well as her costs of litigation and reasonable attorneys' fees pursuant to Rhode Island General Laws § 28-5-24(a) and such other relief as the Court deems appropriate.

## COUNT XI
### *Discrimination - RIGL §42-112-1 et seq,*

217.    Plaintiff restates all previous paragraphs by reference as if stated fully herein.

218.    The defendant did violate R.I.G.L. §42-112-1, the Rhode Island Civil Rights Act, by the facts described herein, by discriminating against plaintiff with respect to hire, tenure, compensation, terms, conditions or privileges of employment because of her religious affiliation, gender, race, country of origin and disability.

219.    As a result, she has suffered and continues to suffer damages.

WHEREFORE, plaintiff prays this Honorable Court award her compensatory, consequential and exemplary damages as well as the costs of litigation and reasonable attorneys' fees pursuant to Rhode Island General Laws § 42-112-2 and such other relief as the Court deems appropriate.

## COUNT XII
### *Retaliation - RIGL §42-112-1 et seq.*

220.    Plaintiff restates all previous paragraphs by reference as if stated fully herein.

221.    The defendants did violate R.I.G.L. §42-112-1, the Rhode Island Civil Rights Act, by the facts described herein, by the facts described herein, by discriminating against her

because he opposed a practice forbidden by the Rhode Island Civil Rights Act and engaged in protected activity in the form of complaints of discrimination.

222.　As a result, she has suffered and continues to suffer damages.

WHEREFORE, plaintiff prays this Honorable Court award her compensatory, consequential and exemplary damages as well as the costs of litigation and reasonable attorneys' fees pursuant to Rhode Island General Laws § 42-112-2 and such other relief as the Court deems appropriate.

## COUNT XIII
*Americans with Disabilities Act, 42 USC 12101 et seq.*

223.　Plaintiff restates all previous paragraphs by reference as if stated fully herein.

224.　Plaintiff is disabled or was perceived as disabled as defined by 42 USC §12102.

225.　The defendants did violate 42 USC §12101 et seq., by the facts described herein, by discriminating against plaintiff with respect to hire, tenure, compensation, terms, conditions or privileges of employment because of her disability.

226.　As a result, she has suffered and continues to suffer damages.

WHEREFORE, plaintiff prays this Honorable Court award her compensatory and consequential damages including but not limited to lost income and punitive damages pursuant to 42 USC §12101 et seq. as well as her costs of litigation and reasonable attorneys' fees and such other relief as the Court deems appropriate.

## COUNT XIV
*Civil Rights of People with Disabilities, RIGL § 42-87-1, et seq.*

227.　Plaintiff restates all previous paragraphs by reference as if stated fully herein.

228.	Plaintiff is disabled or was perceived as disabled as defined by RIGL § 42-87-1.

229.	The defendant did violate R.I.G.L. §42-87-1, *et seq*, by the facts described herein, by discriminating against plaintiff with respect to hire, tenure, compensation, terms, conditions or privileges of employment because of her disability.

230.	As a result, she has suffered and continues to suffer damages.

WHEREFORE, plaintiff prays this Honorable Court award her compensatory and consequential damages including but not limited to lost income and punitive damages pursuant to Rhode Island General Laws 42-87-4 as well as her costs of litigation and reasonable attorneys' fees and such other relief as the Court deems appropriate.

## PLAINTIFF DEMANDS A TRIAL BY JURY

Respectfully submitted,
Sarah Alhouti
By and through her attorney,


David S. Cass, #5044
One Davol Square, 4ᵗʰ Floor
Providence, RI 02903
(508) 889-2674
david@davidcasslaw.com